**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-719** |
| **v.** | : | |
| | : | |
| **CYNTHIA BALLENGER,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Cynthia Ballenger to twelve months of incarceration, which falls at the lower end of the guideline range calculated by the government; twelve months of supervised release; a fine; and $500 in restitution.

**I.      Introduction**

Ballenger, a 42-year-old waitress, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was approximately $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Following a two-day bench trial, this Court found Ballenger guilty of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

As explained herein, a sentence of twelve months of incarceration is appropriate in this case because Ballenger: (1) brought weapons to the Capitol, including a knife and pepper spray; (2) approached the Capitol building after walking past "Area Closed" signs and bike rack barriers; (3) continued forward after seeing rioters bang on a window and say things like, "Are we going to kidnap Pence? That would be cool"; (4) entered the Capitol while ignoring signs that indicated she should not enter, such as alarms blaring, broken glass scattering the floor, lines of police officers in rioter gear, and people climbing through windows; (5) took photographs inside the Capitol as rioters breached the building; (6) bragged about her participation in the Capitol riot on social media; (7) perjured herself at trial; and (8) has not expressed any remorse or accepted responsibility for her actions.

The Court must also consider that Ballenger's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Without the aggregated efforts of rioters like Ballenger, the riot would likely have failed. Here, the facts and circumstances of Ballenger's crimes support a sentence of twelve months of incarceration, twelve months of supervised release, a fine, and $500 in restitution.

## II.   Factual and Procedural Background

### *The Charges and Trial*

On July 30, 2021, the United States charged Ballenger by criminal complaint. On August 9, 2021, law enforcement officers arrested Ballenger in Baltimore, Maryland. On December 8, 2021, the United States charged Ballenger and Price in a Four Count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 20, 2023, a bench trial was held against both defendants on all charges. On March 21, 2023, the Court convicted both defendants on all counts.

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Affidavit in Support of Criminal Complaint), at 1-2.

### *Defendant Ballenger's Role in the January 6, 2021 Attack on the Capitol*

As the Court found, Ballenger was a knowing participant in the mob. Ballenger was eager to travel to Washington, D.C. on January 6 because she considered the election results to be fraudulent and wanted to change the outcome. On January 3, 2021, Ballenger commented on the former president's Facebook post: "January 6th!!! The time has come!" Ex. 307 at 1; Trial Tr. Mar. 21, 2023 at 167.[2] On January 5, 2021, on Facebook, Ballenger's friend detailed alleged voter fraud in the presidential election and said Democrats were "Cheating!!!" by "changing votes to dems from reps." Ballenger responded, "You know it!! Why wouldn't they??? They got away with it the first time!!! No accountability for anything ever unless it is us." The friend responded,

---

[2] To avoid confusion, the government has retained the exhibit numbering of its trial exhibits in this sentencing memorandum. Citations to "Ex. __" refer to these trial exhibits. These exhibits are included with this sentencing memorandum. Citations to "Trial Tr." refer to the transcript from the trial.

"Something us Americans has to do about it." Ballenger replied, "Something more than vote 😣 that's for sure." Ex. 307 at 11.

On January 6, 2021, Ballenger and her husband, Christopher Price, traveled to Washington, D.C. from their home in Maryland to attend the "Stop the Steal" rally. They were prepared for possible violence. Ballenger armed herself with pepper spray and a knife. Trial Tr. Mar. 21, 2023 at 74, 167; Ex. 307 at 9 (Ballenger message: "😣 bought pepper spray first time ever"), *id.* at 10 (Ballenger message: "And bring a pocket knife for sure!! Hopefully won't need it but will have it if I do"). Ballenger also considered bringing bear spray at the request of Price – but it wouldn't fit in her purse. Trial Tr. Mar. 21, 2023 at 75-76; Ex. 307 at 9-10.

Once in Washington D.C., Ballenger and Price attended the "Stop the Steal" rally at the Ellipse. After Ballenger's friend texted her that the Capitol had been breached, Ballenger and Price marched to the Capitol grounds – and, along the way, saw a multitude of police cars with sirens, police officers, and fire engines with lights flashing. Trial Tr. Mar. 21, 2023 at 91-92, 168. When Ballenger and Price reached the outer edge of the restricted perimeter, they climbed over an Olmsted wall, which is a permanent security structure, Trial Tr. Mar. 20, 2023 at 36.

Ballenger recorded a video as she and Price reached the Upper West Terrace, which showed the pair walking past a bike rack with an "AREA CLOSED" sign on it. Ex. 301 at 0:00-0:10. Sirens blared in the background. *Id.* at 0:10-0:39. A police officer walked by and a rioter yelled, "Traitor, you are fucking traitors!" *Id.* at 0:39-1:10. Ballenger continued to record the path to the door as rioters chanted "WHOSE HOUSE, OUR HOUSE!" As they continued walking toward the Upper Northwest Terrace, Price said, "This is crazy. Look at this shit. They're going to be pissed at Trump for this." Ex. 300 at 1:05-1:23.

Before entering the Capitol building, Price walked to a window and Ballenger followed and recorded with her cell phone. Someone next to Price and Ballenger said, "Are we going to kidnap Pence? That would be cool." Price approached the window, smiled, and watched as another rioter pounded on the window. Ex. 208. Price then peered into the window.

 

*Figures 1 & 2: Screenshot of video footage showing Price at a window to the Capitol building, left (Ex. 105), and a woman banging on the window, right (Ex. 106).*

Price and Ballenger marched closer to the Senate Wing Door and, before they made it there, they posed for a photo.



*Figure 3: Photo of Cynthia Ballenger and Christopher Price posing in front of the Capitol building prior to entering the building (Ex. 305)*

Ballenger and Price entered the Capitol building through the Senate Wing Door at 3:07 p.m. Ex. 202C at 1:00-1:09. As they entered, alarms blared, *see* Ex. 203 at 0:01; Ex. 205 at 8:43;

Ex. 702 at 1:40-2:00, tear gas filled the air, and police officers stood guard, Trial Tr. Mar. 21, 2023

at 169.



*Figure 4: Screenshot of Capitol surveillance footage showing Cynthia Ballenger and Christopher Price entering the Capitol building (Ex. 109)*

Ballenger and Price walked down the hallway toward the Crypt. They eventually turned

around and walked back toward the Senate Wing Door area, taking photos along the way.

 

*Figures 5 & 6: Photo showing of inside the Capitol building, left (Ex. 103), and selfie photo showing Ballenger and Price, right (Ex. 104)*

Once back in the Senate Wing Door foyer, the defendant walked past broken glass and

through the crowd chanting, "Fight for Trump!" Ex. 206 at 1:53-2:28. After exiting the Capitol

building, Ballenger and Price remained on Capitol grounds to watch the chaos continue to unfold.

Ballenger took photos and video of rioters trying to gain access into the Capitol building through the North Door.



*Figure 7: Photo showing rioters attempting to breach the North door taken by Ballenger (Ex. 110 at 17)*

In a video, Ballenger commented, "This is when they got in one more time somehow and got gassed again." Ex. 307 at 6. Ballenger later sent that video to a friend on Facebook with the caption, "Notice the Texas flag sticking out the door after the gas comes out I thought that was great Texas will not back down 😣."

Ballenger and Price stayed on restricted grounds and watched as a mob of rioters attempted to break through the North Door. *See* Ex. 202E.



***Figure 8: Screenshot of Capitol surveillance footage showing Ballenger and Price (yellow circle) watching rioters attempt to breach the Capitol (Ex. 202E at 6:20)***

In Ballenger's video recording, rioters nearby Ballenger said things like, "We went inside, they can't stop you. It's the people's house." *Id.* at 2:45-3:04. As tear gas emanated from the building, a rioter, likely Price, can be heard on Ballenger's video saying, "there's the tear gas, is that the tear gas? Here comes the tear gas! I wanna get tear gassed. Wanna get a little breath of that to say we got tear gassed. . . . Here comes all the runny eyes. That stuff will mess you up." *Id.* at 3:35-4:12; Trial Tr. Mar. 20, 2023 at 164. Shortly after, a rioter, again likely Price, said, "oh no we'll be the most violent protestors ever." Another rioter responded, "When you steal an election, what do you expect? The people voted. The people voted." *Id.* at 4:12-4:50.

At 4:51 p.m., Ballenger sent text messages to her friend: "We stormed the capital" and "We totalled owed [sic] it!!" Ex. 107 at 10. As Ballenger and Price finally started to leave Capitol grounds, Ballenger stood in front of snow fencing, waved her flag in the air, and smiled as Price took a photo. Trial Tr. Mar. 20, 2023 at 41.



***Figure 9: Photo of Ballenger standing in front of snow fencing on Capitol grounds holding a flag (Ex. 107 at 26)***

On the way home from the Capitol, Ballenger's son texted her: "Are U guys ok?" Ballenger responded, "Yes we are good on are way home now." Ex. 110 at 23. The son replied, "Glad to

hear, I see they got inside the capital lmao." *Id.* Ballenger responded, "[S]o did me and chris." *Id.*
A few messages later, Ballenger said, "Ppl are pissed!!" Ex. 110 at 24.

On January 9, 2021, Ballenger wrote on Facebook that January 6 "looked like a set up"
and "ppl were just let in the capital building… Some did force their way in and cause damage and
they should and will hopefully be charged!!" Ex. 306 at 3. On January 12, 2021, Ballenger posted
on Facebook, "They cheated and we know it! They make us out to sound crazy that will make us
do crazy things." Ex. 306 at 6. In the same post, she said that people were "fed up with everything
that is going on. Not enough to smash windows but to go in a building to be heard yes maybe." *Id.*

On February 25, 2021, Ballenger posted on Facebook, "All we ever hear is what bad stuff
they are doing to use [sic] and never what is being done. Ok well legislation after legislation that
go NOWHERE! It's no wonder the Capitol got breached ppl r pissed!! Nothing is getting done!"
Ex. 306 at 10.

*Ballenger's Trial Testimony*

At trial, Ballenger testified that, on January 6, 2021, in while she was in a local café, a
person messaged her on Facebook that Trump supporters had breached police lines. Trial Tr. Mar.
21, 2023 at 40. Ballenger testified that that information was "unverified" but also that she knew
"Senators were supposed to be objecting to the process" on January 6. *Id.* at 43.

After leaving the café, Ballenger testified that she and Price walked to the Capitol and that
they did not see any bicycle racks, signs, barricades, or obstructions to the Capitol building, and
that "everybody was very pleasant" at the Capitol and "it was very orderly." *Id.* at 47-48, 54. She
testified that she could not hear an alarm when she entered the building. *Id.* at 55.

On cross examination, Ballenger admitted that she brought a pocket knife and pepper spray
to the Capitol, *id.* at 73-74, and "joked" about bringing bear spray, *id.* at 74-75.  Despite Facebook

records showing that she posted an article about executing Mike Pence, Ballenger denied doing so. *Id.* at 81. She testified that she did not recall that she posted on Facebook about Donald Trump winning the election and Democrats committing treason. *Id.* at 82. When shown a video that she filmed of a man saying, "are we going to kidnap Pence," Ballenger purported not to be paying attention and denied hearing the comment that was in her video. *Id.* at 84. Ballenger claimed that she did not see police officers outside, broken glass as she was walking inside the Capitol building, and people climbing through windows. She testified that she wasn't paying attention to anything other than her husband. *Id.* at 86.

While en route to the Capitol, Ballenger admitted that she heard flash bangs. *Id.* at 90. Ballenger testified that "there was a lot to see" so she "didn't really notice" the snow fencing, bike racks, police officers, flash bangs, and loud noises despite these signs appearing in her videos. *Id.* at 94-99. Ballenger admitted during cross examination that when she entered the Capitol building, loud sirens blared. *Id.* at 105. She admitted that despite the "many signs" indicating she should not enter, she entered anyway, because she did not receive a specific instruction to do otherwise. *Id.* at 109-110. Ballenger testified that she knew that Congress and, specifically, Mike Pence was inside the Capitol building on January 6 certifying the Electoral College votes. *Id.* at 115.

When shown a text message that she sent after leaving the Capitol on January 6 that said "We stormed the Capitol. We totally owed it," Ballenger did not admit that she made a typo and that "owed it" should have read "owned it." *Id.* at 117. Ballenger explained Price's comment that "we're just taking over the Capitol" as a "tongue in cheek comment" and described it as a "joke." *Id.* at 119.

After exiting the Capitol building, but while still on Capitol grounds, Ballenger and Price watched for about ten minutes as rioters breached the North Door. Ballenger recorded a seven-

minute video. Ballenger testified repeatedly that she did not hear the commentary from her video about people getting maced, breaking into the Capitol, and saying "they can't stop us." *Id.* at 120-124.

The Court found that Ballenger's trial testimony was "largely incredible." *Id.* at 170. The Court explained that Ballenger "denied things that were patently obvious," and "she simply wasn't credible on what she saw before entering." *Id.* Regarding her posts on and around January 6, the Court found that Ballenger's "back and forth with the government on the 'totally owned it' was ridiculous. The idea that to deny that what she meant was totally *owned* it made her just seem like she wasn't telling the truth to me." *Id.* The Court also found that "[t]he fact that she didn't see officers when she walked in wasn't credible. The fact that she didn't see broken glass when she walked in wasn't credible. And her refusal to agree that, on Facebook, when she said she wanted to be heard and that's why she went into the Capitol also was simply not credible to me. So I discount all of her testimony in regard to her motives and what she saw and heard upon entry because I just don't find it credible." *Id.*

## III.    Statutory Penalties

Ballenger now faces a sentencing on all four counts. As noted by the U.S. Probation Office, Ballenger faces up to one year of imprisonment her violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and six months imprisonment for her violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). She also faces a fine of up to $100,000.

## IV.    The Sentencing Guidelines and Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with Probation that the Sentencing Guidelines offense level is 12, but disagrees with Probation on the process to calculate that offense level. The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. §1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. §1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

In the pre-sentence report, the Probation Office did not employ this specified procedure to determine the total combined offense level. Rather, the Probation Office started with the grouping analysis in Part D of Chapter 3, PSR ¶ 36, then performed the Guidelines analysis, but only for Count Two, PSR ¶¶ 38-46. The Probation Office calculated the offense level for Count Two as follows:

| <u>Count Two: 18 U.S.C. § 1752(a)(2)</u> | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2A2.4(a) | +10 |
| Obstruction of Justice | U.S.S.G. §3C1.1 | + 2 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+12** |

The U.S. Probation Office calculated Ballenger's criminal history as a Category I. PSR at ¶ 49. Accordingly, the Probation Office calculated Ballenger's corresponding Guidelines imprisonment range at 10 to 16 months. PSR at ¶ 91.

The appropriate offense level computations for Count One and Count Two, prior to any grouping analysis under Part D of Chapter 3, are as follows:

Count One: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2B2.3(a) | +4 |
| Specific Offense Characteristics | U.S.S.G. §2B2.3(b)(1)(A) | +2 |
| Obstruction of Justice | U.S.S.G. §3C1.1 | +2[3] |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+8** |

Count Two: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2A2.4(a) | +10 |
| Obstruction of Justice | U.S.S.G. §3C1.1 | + 2 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+12** |

*See* PSR at ¶¶ 33-46.

The government agrees with the Probation Office that Counts One and Two group because all involve the same victim: Congress. U.S.S.G. §3D1.2(d). The offense level for that Group is the level "for the most serious of the counts compromising the Group, *i.e.*, the highest offense level of the counts in the Group." U.S.S.G. §3D1.3(a). Since Count Two has the highest offense level for any count in the group, the offense level for the group is **12**. Accordingly, the government agrees with the Probation Office that Ballenger's Guideline imprisonment range calculation is 10 to 16 months. For the reasons that follow, the government asks this Court to impose a sentence of twelve months of incarceration, in the lower end of that range.

Here, while the Court must consider the Section 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this

---

[3] United States Sentencing Guidelines § 3C1.1 applies to Counts One and Two because Ballenger "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct or (B) a closely related offense." That is, at trial, Ballenger took the stand to testify in her defense and repeatedly testified "incredibl[y]." Trial Tr. Mar. 21, 2023, at 170.

Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of incarceration of ten months.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ballenger's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ballenger, the absence of violent or destructive acts is not a mitigating factor. Had Ballenger engaged in such conduct, she would have faced additional criminal charges.

The nature and circumstances of Ballenger's offenses warrant the requested sentence. Ballenger shared a Facebook post about executing Mike Pence, bragged about traveling to the Capitol on January 6 where she knew the certification was taking place, and felt proud of her actions following the riot. Despite all the signs that the riot was not peaceful, Ballenger joined it

14

anyway, and entered the Capitol anyway. And since January 6, Ballenger has failed to accept responsibility for her actions. Notably, Ballenger also repeatedly lied under oath at trial. Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Ballenger

As set forth in the PSR, Ballenger's criminal history consists of several drug related charges and a burglary charge. PSR ¶¶ 48, 51. Ballenger has denied the use of any illicit substances, but she has refused to undergo a drug test at the request of U.S. Probation, even though it was part of the presentence investigation process as ordered by the Court. PSR ¶ 68.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence:* There is a need for specific deterrence in this case. To date, Ballenger has not expressed any remorse or regret for her actions, nor has she acknowledged that her conduct on January 6 – joining a mob that stormed the Capitol building – was wrong. Specific deterrence

is necessary to dissuade Ballenger from future riotous, vigilante activity—especially where she is faced with an election outcome she does not like.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Ballenger based on her own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

Ballenger was found guilty of four Counts: 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). These offenses are Class A and B misdemeanors, respectively. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United*

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the

defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Rivera*, 21-cr-60 (CKK), following a bench trial, the defendant was convicted of the same four misdemeanor charges of which Ballenger stands convicted. The evidence showed that, on January 6, Rivera ignored numerous signs indicating he should not have been on Capitol grounds. Rivera recorded rioters making their way through the police line on the Lower West Terrace and announced to his social media followers that officers were firing pepper spray at the rioters. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way to get up!" Rivera also watched as rioters breached the Parliamentarian's door. Rivera entered the building through a window next to the Senate Wing Door. After January 6, Rivera did not express remorse or contrition for his actions; instead, he celebrated his participation on social media. The court sentenced Rivera to eight months in prison.

Like Rivera, Ballenger ignored numerous signs that she should not have been on Capitol grounds. Ballenger took numerous videos of the chaos at the Capitol on January 6 and, like Rivera, saw police officers deploy chemical irritants. Ballenger also similarly watched – and recorded – as rioters breached a door at the Capitol. Also like Rivera, Ballenger has not expressed remorse for her conduct, nor has she accepted responsibility for her conduct. A longer sentence is warranted

for Ballenger, however, because Ballenger repeatedly lied under oath during her testimony at trial (Rivera did not testify) and brought pepper spray and a knife to the Capitol.

In *United States v. Alford*, 21-cr-263 (TSC), following a jury trial, the defendant was convicted of the same four misdemeanor charges of which Ballenger stands convicted. On January 6, Alford walked past obvious signs that the Capitol was restricted until he could find an unobstructed entrance. He entered through a Capitol building door that had clear signs that it had been broken into. After January 6, Alford celebrated his participation on social media and spread disinformation about the riot. At trial, Alford demonstrated a lack of candor and honesty during his testimony; the court found that Alford testified in a manner that was disingenuous, that was not forthcoming, and that minimized his role. Alford also showed a lack of awareness of the seriousness and gravity of what happened on January 6. The court sentenced Alford to 12 months' incarceration.

Like Alford, Ballenger saw numerous signs indicating that the Capitol grounds and building were restricted. Nevertheless, Ballenger, like Alford, entered the building over the broken glass, clearly demonstrating that the building had been forcefully breached. Like Alford, Ballenger celebrated her participation on social media, neglected to express any remorse for her conduct, and minimized her participation on January 6. Also like Alford, Ballenger testified untruthfully at trial. Ballenger brought weapons to the Capitol, an aggravator that distinguishes Ballenger from Alford. A comparable sentence for Ballenger is warranted.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as

"a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[5]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Ballenger to pay $500 in restitution for her convictions on Counts One through Four. This amount fairly reflects Ballenger's role in the

---

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

The defendant's convictions subject her to a statutory maximum fine of $100,000. 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. The defendant has jointly raised with her co-defendant $33,752 on a crowdsourcing fundraising platform, with net earnings of $31,613. *See* PSR ¶ 60; *see also* PSR ¶ 86.  As the final PSR notes, the campaign page indicates that the defendant and her husband were "investigated and unfairly charged," emphasizing that she and her husband were treated like "hardened criminals" despite being peaceful and not engaging in violence at the Capitol. Defendant Price confirmed that he and his wife's objective is to earn money for their cause.

## VIII.    Conclusion

Sentencing requires the Court to carefully balance the Section 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Ballenger to twelve months' incarceration, twelve months of supervised release, a fine, and $500 in restitution. Such a sentence

protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Ashley Akers
Trial Attorney
MO Bar No. 69601
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov

/s/ Andrew Haag
ANDREW S. HAAG
Assistant United States Attorney
MA Bar No. 705425
601 D Street, N.W.
Washington, DC 20530
(202) 252-7755
Andrew.Haag@usdoj.gov